UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x
GREGORY J. BAURNES, Individually and on :
Behalf of All Others Similarly Situated,
                                 :
                 Plaintiff, :
                                 :
      vs. :
                                   :
LPL FINANCIAL HOLDINGS INC. and LPL :
FINANCIAL LLC, :
                                 :
               Defendants. :
                                 :
—————————————————————— x

Civil Action No.

<u>CLASS ACTION</u>

CLASS ACTION COMPLAINT

<u>DEMAND FOR JURY TRIAL</u>

By and through his undersigned counsel, Gregory J. Baurnes ("Plaintiff") brings this class action against defendants LPL Financial Holdings Inc. ("LPL Holdings") and LPL Financial LLC ("LPL Financial") (collectively, "Defendants" or "LPL"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including, but not limited to, review and analysis of: (a) documents created and distributed by Defendants; (b) public filings made by LPL with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases disseminated by Defendants; and (d) news articles, websites, and other publicly available information concerning Defendants.    Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.    Plaintiff brings this class action to recover damages arising out of Defendants' unlawful conduct related to LPL Financial's Sweep Programs (defined below).  Under the Sweep Programs, Defendants swept idle customer cash into interest-bearing accounts at banks selected by Defendants.

2.    The cash sweep accounts were highly lucrative for Defendants but paid unreasonably low, below-market interest rates to customers.  As such, Defendants used the Sweep Programs to generate massive revenue for themselves at the expense of their customers.

3.    Defendants' use of the Sweep Programs to enrich themselves by paying unreasonably low interest rates to customers breached their fiduciary duties and contractual obligations and violated several state and federal laws including the Racketeer Influenced and Corrupt Organizations Act ("RICO Statute") and the Investment Advisers Act of 1940 ("Advisers Act").

4.     Accordingly, the Sweep Programs have come under scrutiny by federal and state regulators, including an SEC inquiry disclosed in August 2024.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) and (6), because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (c) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.  This Court also has subject matter jurisdiction under 18 U.S.C. §1964(c), 28 U.S.C. §1331, and 15 U.S.C. §80b-14 because Plaintiff brings claims arising under the RICO Statute, 18 U.S.C. §1962, and the Advisers Act, 15 U.S.C. §80b-1-80b-21.

6.     This Court has personal jurisdiction over Defendants because, during the relevant time period, Defendants had offices in, did sufficient business in, had sufficient contacts with, and intentionally availed themselves of the laws and markets of New York through the promotion, sale, marketing, distribution, and operation of their products and services.

7.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because, during the relevant time period, Defendants transacted business and had offices in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

8.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails and interstate telephone communications.

## PARTIES

**Plaintiff**

9.     Plaintiff Gregory J. Baurnes is a citizen of Pennsylvania.  During the relevant time period, Plaintiff held a Roth IRA account with LPL.  Uninvested cash Plaintiff held in his account

was swept into the banks that Defendants selected in their discretion at the unreasonably low interest rates alleged herein.

**Defendants**

10.     Defendant LPL Financial Holdings Inc. is a Delaware corporation headquartered at 4707 Executive Drive, San Diego, California 92121.  LPL Holdings is a financial services company that conducts business throughout the United States, with approximately $1.6 trillion in assets under management and 8,400 employees.  LPL Holdings is the parent company and control person of LPL Financial.

11.     Defendant LPL Financial LLC is a Delaware limited liability company headquartered at 1055 LPL Way, Fort Mill, South Carolina 29715.  During the relevant time period, LPL Financial was a broker-dealer and a Registered Investment Advisor.  LPL Financial was LPL's agent for the establishment, maintenance, and operation of Defendants' Sweep Programs.  LPL Financial was a wholly owned subsidiary of, and controlled by, LPL Holdings.

## SUBSTANTIVE ALLEGATIONS

**Background on Defendants' Sweep Programs**

12.     During the relevant time period, LPL offered brokerage and investment advisory services to customers nationwide.  These services included two automatic cash sweep programs that were provided to customers through LPL Financial as broker and agent: (1) the LPL Insured Cash Account program ("ICA Program") for most LPL account types, including both non-retirement and retirement (IRA) accounts and certain investment advisory accounts; and (2) the LPL Deposit Cash Account program ("DCA Program") for qualified advisory IRA accounts (collectively, "Sweep Programs").

13.    The terms and conditions of the ICA Program were set forth in the LPL Master –
Account Agreement ("Master Account Agreement"),[1] LPL Financial Brokerage Compensation
and Conflicts Disclosure ("Compensation and Conflicts Disclosure"),[2] Banking & Lending
Solutions Insured Cash Account Disclosure Booklet ("ICA Program Disclosures"),[3] and LPL
Financial LLC (LPL) Relationship Summary[4] (collectively, "ICA Program Documents"), which
were posted on LPL's public website.  The Master Account Agreement was governed by the laws
of the Commonwealth of Massachusetts.

14.    Under the ICA Program, LPL Financial automatically swept eligible clients'
uninvested cash balances into interest-bearing deposit accounts ("ICA Deposit Accounts") at
banks or other depository institutions selected by Defendants ("ICA Program Banks").[5]  Funds in
the ICA Deposit Accounts were insured by the Federal Deposit Insurance Corporation ("FDIC").[6]

15.    The ICA Program Documents provided that LPL Financial was the agent of LPL
customers in ICA Program:

- "Under the ICA program, LPL Financial ('LPL'), acting as your agent, will
  automatically transfer (or 'sweep') available cash balances in your eligible
  accounts—including proceeds of securities transactions, dividend and interest

---

[1]   LPL    Financial,    *Account    Packet    –    LPL    Master    Account*,
https://www.lpl.com/content/dam/edam/format/disclosure/ap-lpl.pdf (last visited Jan. 23, 2025) at
5-23.

[2]   *Id.* at 28-38.

[3]   LPL Financial, *Banking & Lending Solutions Insured Cash Account Disclosure Booklet*,
https://www.lpl.com/content/dam/lpl-www/documents/disclosures/lpl_ica-disclosure-booklet.pdf
(July 2024).

[4]   *Account Packet – LPL Master Account*, *supra* note at 1 at 1-4.

[5]   *Banking & Lending Solutions Insured Cash Account Disclosure Booklet*, *supra* note 2 at 3;
*Account Packet – LPL Master Account*, *supra* note 1 at 6, 30.

[6]   *Id.*

payments, cash deposits, and other monies—into interest-bearing deposit accounts ('Deposit Accounts') insured by the Federal Deposit Insurance Corporation ('FDIC')."[7]

- "[ICA] Deposit Account ownership will be evidenced by a book entry on the account records of each [ICA Program] Bank showing the [ICA] Deposit Account as an agency account held by LPL for the benefit of you and other LPL customers, and by records maintained by LPL as your agent."[8]

- "Cash balances swept from an LPL account into one or more [ICA] Deposit Accounts in the name of LPL as agent for the exclusive benefit of its customers benefit from FDIC insurance to the same extent as if deposited in the name of the accountholders."[9]

16.    The terms and conditions of the DCA Program were set forth in the Master Account Agreement,[10] Compensation and Conflicts Disclosure,[11] Banking & Lending Solutions Deposit Cash Account Disclosure Booklet[12] ("DCA Program Disclosures"), and LPL Financial LLC (LPL) Relationship Summary[13] (collectively, "DCA Program Documents"), which were posted on LPL's public website.

---

[7]    *Banking & Lending Solutions Insured Cash Account Disclosure Booklet*, *supra* note 2 at 3; *see also id.* at 4 ("As your agent, LPL will sweep cash out of your eligible account and into [ICA] Deposit Accounts held by the participating [ICA Program] Banks."); *Account Packet – LPL Master Account*, *supra* note 1 at 7 ("As your agent, LPL will sweep cash out of your LPL Account and into the participating banks, subject to certain capacity limits, but not to exceed the maximum levels of insurance as defined by the FDIC per category.").

[8]    *Banking & Lending Solutions Insured Cash Account Disclosure Booklet*, *supra* note 2 at 13.

[9]    *Id.* at 4.

[10]    *Account Packet – LPL Master Account*, *supra* note 1 at 5-23.

[11]    *Id.* at 28-38.

[12]    LPL Financial, *Banking & Lending Solutions Deposit Cash Account Disclosure Booklet*, https://www.lpl.com/content/dam/lpl-www/documents/disclosures/lpl_dca-disclosure-booklet.pdf (July 2024).

[13]    *Account Packet – LPL Master Account*, *supra* note 1 at 1-4.

17.     Similar to the ICA Program, under the DCA Program, LPL Financial automatically swept eligible clients' uninvested cash balances into interest-bearing deposit accounts ("DCA Deposit Accounts" and, together with the ICA Deposit Accounts, "Deposit Accounts") at banks or other depository institutions selected by Defendants ("DCA Program Banks" and, together with ICA Program Banks, "Program Banks").[14]  Funds in the DCA Deposit Accounts were insured by the FDIC.[15]

18.     The DCA Program Documents provided that LPL Financial was the agent of LPL customers in the DCA Program:

- "LPL acts as your agent when sweeping cash to [DCA] Deposit Accounts at each Bank on the DCA program [Available Bank List]."[16]

- "As your agent, LPL will sweep your cash out of your LPL account and into the participating [DCA Program] Banks, subject to certain capacity limits, but not intending to exceed the maximum levels of insurance as defined by the FDIC per category."[17]

- "[DCA] Deposit Account ownership will be evidenced by a book entry on the account records of each Bank showing the Deposit Account as an agency account held by LPL for the benefit of you and other LPL customers, and by records maintained by LPL as your agent."[18]

19.     Additionally, LPL retirement accounts in the ICA Program and DCA Program were subject to several additional documents including the Retirement Plan Brokerage Account

---

[14]   *Banking & Lending Solutions Deposit Cash Account Disclosure Booklet*, *supra* note 12 at 3.

[15]   *Id.*

[16]   *Id.*

[17]   *Id.*; *see also id.* at 7 ("LPL as your agent will maintain your [DCA] Deposit Accounts in accordance with the FDIC-defined ownership category limits ($250,000).").

[18]   *Id.* at 9.

Agreement ("IRA Account Agreement")[19], Retirement Plan Brokerage Services Agreement ("IRA Services Agreement")[20], Custodial Agreement PTC – IRA ("IRA Custodial Agreement")[21], and, with respect to Roth IRA accounts, the Custodial Agreement PTC – Roth IRA ("Roth Custodial Agreement")[22], (collectively, "Retirement Documents" and, together with the ICA Program Documents and the DCA Program Documents, "Program Documents").   The Retirement Documents were governed by Massachusetts law.

**Defendants Reaped Significant Benefits from Their Sweep Programs to the Detriment of Customers, Who Were Paid Unreasonably Low Interest Rates**

20.     The Sweep Programs provided highly lucrative financial benefits to Defendants due to fees that the Program Banks paid to LPL based on the amount of customer cash swept by LPL into the Deposit Accounts.  With respect to the ICA Program, LPL stated:

> Each [ICA Program] Bank will pay LPL a fee equal to a percentage of the average daily deposit balance in each [ICA] Deposit Account.  Such fees differ among the participating [ICA Program] Banks depending on the interest rate environment and/or any fee waivers made by LPL.  The fee paid to LPL will be at an annual rate of up to an average of 600 basis points [6%] as applied across all [ICA] Deposit Accounts taken in the aggregate.[23]

---

[19]   LPL    Financial,    *Retirement    Plan    Brokerage    Account    Agreement*, https://www.lpl.com/content/dam/lpl-www/documents/disclosures/AP-RP-Brokerage.pdf     (last visited Jan. 23, 2025).

[20]   *Id.*

[21]   LPL Financial, *Custodial Agreement PTC – IRA*, https://www.lpl.com/content/dam/lpl-www/documents/TradeDirect/FR110.pdf (March 2002).

[22]   LPL, *Custodial Agreement PTC – Roth IRA*, https://www.lpl.com/content/dam/lpl-www/documents/TradeDirect/FR111.pdf (March 2002).

[23]   *Banking & Lending Solutions Insured Cash Account Disclosure Booklet*, *supra* note 2 at 8; *see also id.* ("The interest rates paid are determined by the amount the Banks are willing to pay minus the fees paid to LPL and other parties."); *Account Packet – LPL Master Account*, *supra* note 1 at 8 ("In the ICA program, LPL receives a fee equal to a percentage of the average daily deposit balance in each ICA Deposit Account.  The fee paid to LPL will be at an annual rate of up to an average of 600 basis points as applied across all ICA Deposit Accounts taken in the aggregate.");

21.    LPL acknowledged that "[t]he fees that LPL receives from the [ICA Program] Banks are an important revenue stream and present a conflict of interest for LPL because LPL benefits financially if cash is swept into the ICA program."[24]

22.    LPL further explained that, while the fees paid by the ICA Program Banks were "an important revenue stream" for LPL, they had the effect of reducing the interest paid to customers in the ICA Program, such that customers could receive "a negative overall investment return":

> The fee paid to LPL reduces the interest rate paid on your cash, and depending on the interest rate and other market factors, LPL generally receives as its fee the majority of the amount paid by the [ICA Program] Banks with respect to such deposits. Depending on interest rates and other market factors, the yields on the ICA program have been, and may continue in the future to be, lower than the aggregate fees and expenses received by LPL for your participation in the ICA program. This can result in you experiencing a negative overall investment return with respect to cash reserves in the ICA program.[25]

---

*id.* at 31 ("For [the] ICA [Program], under its agreement with each bank in which LPL deposits customer cash, LPL receives a fee from the banks equal to a percentage of the average daily deposit balance in the ICA [Program].").

[24] *Banking & Lending Solutions Insured Cash Account Disclosure Booklet*, *supra* note 2 at 9; *see also id.* ("[W]e have an incentive for you to use (and invest your assets in) the sweep products that increase our compensation. We also have an incentive to assign your accounts to the [Priority Bank List ('PBL')] that earns LPL higher fees. As new deposit capacity becomes available, LPL assigns such additional capacity between PBL1 and PBL2 and its other sweep programs at its sole discretion. LPL has a conflict of interest with respect to allocations of additional sweep capacity to programs and arrangements that will increase its compensation."). The SEC also recognizes that "cash sweep programs" are a "common source[] of conflicts of interest." U.S. Securities and Exchange Commission, Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest (Sept. 9, 2024), https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

[25] *Banking & Lending Solutions Insured Cash Account Disclosure Booklet, supra* note 2 at 9; *see also Account Packet – LPL Master Account, supra* note 1 at 3 ("We receive fees for your participation in these 'cash sweep' programs from the banks sponsoring the programs. The fees we receive are typically higher than the interest you earn on the cash held in the bank accounts and are in addition to any fees you pay to us. This creates an incentive for LPL if you maintain a cash balance in your account."); *id.* at 31 ("The fee paid to LPL is at an annual rate of up to an average of 6% as applied across all deposit accounts taken in the aggregate; therefore, depending on interest

23.    LPL also acknowledged that, as a result of the ICA Program, LPL earned not one but two layers of fees from advisory accounts: "If you are investing through an advisory account, the fees that LPL receives from the [ICA Program] Banks is in addition to the advisory fee that you pay LPL and your financial professional.  This means that LPL earns two layers of fees on the same cash balances in your LPL account. . . .  Therefore, we have an incentive for you to use (and invest your assets in) the sweep products that increase our compensation."[26]

24.    Similarly, the DCA Program Documents provided that DCA Program Banks would pay fees to LPL as well as a third-party administrator:

> The interest rates payable under the DCA program are determined by the amount the Banks are willing to pay minus the fees paid to LPL and other parties (detailed below). . . .
>
> Under the DCA program, each [DCA Program] Bank will pay an amount equal to a percentage of the average daily aggregated omnibus cash deposit balance. This amount generally covers the fee for the third-party administrator (Administrator), LPL's fees, and interest payable to participating accounts. Different [DCA Program] Banks pay different amounts.[27]

25.    As in the ICA Program, these payments to LPL and the third-party administrator had the effect of reducing the interest rate paid to DCA Program customers:

> The amounts paid to LPL and the Administrator reduces the interest rate paid on your cash, and depending on the interest rate and other market factors. You should understand that, depending on interest rates and other market factors, the yields on the DCA program have been, and may continue in the future to be, lower than the aggregate fees and expenses received by LPL for your participation in the DCA

---

rates and other market factors, on some accounts, fees to LPL may be higher or lower than this average percentage amount. . . . Depending on interest rates and other market factors, the yields on the ICA [Program] . . . have been, and may continue in the future to be, lower than the aggregate fees and expenses received by LPL for a customer's participation in the cash sweep programs. This may result in a customer experiencing a negative overall investment return with respect to cash balances in the cash sweep programs.").

[26]    *Banking & Lending Solutions Insured Cash Account Disclosure Booklet*, *supra* note 2 at 9.

[27]    *Id.* at 5.

program. This can result in you experiencing a negative overall investment return with respect to cash reserves in the DCA program.[28]

26.     LPL further admits that the "DCA Program Fees that LPL receives is in addition to the advisory fee that you pay LPL and your financial professional.  Therefore, we have an incentive to encourage you to enroll in the DCA Program."[29]

27.     Due to these adverse financial incentives, Defendants failed to negotiate and secure reasonable sweep interest rates for customers in the Sweep Programs.  As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."

28.     The United States Department of Labor defines a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated."[30]

29.     Similarly, the United States Internal Revenue Service defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."[31]  Thus, an interest rate is reasonable if it is based on a fair market valuation.

---

[28]   *Id.* at 7.

[29]   *Id.*

[30]   Grant of Individual Exemptions, Deutsche Bank AG, 68 Fed. Reg. 34646 (June 10, 2003).

[31]   26 C.F.R. §1.482-2(a)(2).

30.     In contrast, the Sweep Programs paid miniscule, below-market interest rates throughout the relevant time period.  The ICA Program rates currently range from 0.31% to 2.0% depending on the amount deposited by a customer[32], while the DCA Program rate is currently 0.35%.[33]  These rates were *significantly* lower several objective benchmarks of reasonableness:

- **Competitors' Deposit Accounts**.  Defendants' sweep interest rates were far below fair market value, as demonstrated by the rates paid by their competitors. According to the FDIC, the national rate of interest paid by money market deposit products offered by insured depository institutions and credit unions currently averages 0.66%.[34]  Moreover, competitors offering FDIC-insured sweep accounts similar to those in the Sweep Programs pay even higher rates.  For example, competitor Moomoo's rate currently is 4.1%,[35] Webull's rate is 3.75%,[36]

---

[32]  LPL Financial, *Brokerage & Lending Solutions LPL Insured Cash Account Current Interest Tier Rates*, https://www.lpl.com/content/dam/lpl-www/documents/disclosures/insured-cash-account-current-interest-rate-tiers.pdf (Sept. 27, 2024).

[33]  LPL Financial, *Brokerage & Lending Solutions Deposit Cash Account – Interest Rate and Fee*, https://www.lpl.com/content/dam/lpl-www/documents/disclosures/DCA-Rate-and-Fee-LPLF-2024.pdf (last visited Jan. 23, 2025).

[34]  Federal Deposit Insurance Corporation, *National Rates and Rate Caps* (Dec. 16, 2024), https://www.fdic.gov/national-rates-and-rate-caps.  The FDIC defines the national rate of interest as "the average of rates paid by all insured depository institutions and credit unions for which data is available, with rates weighted by each institution's share of domestic deposits."  *Id.*  Informa Research Services, a company that specializes in compiling business data, also found that FDIC-insured United States banks consistently pay significantly higher interest rates than Defendants on deposit accounts, including average rates ranging from 0.19% to 0.36% from August 2017 through March 2019.

[35]  Moomoo Financial Inc., *Boost your uninvested cash with 4.1% APY*, https://www.moomoo.com/us/invest/cashsweep (last visited Jan. 23, 2025).

[36]  Webull, *Webull High-Yield Case Management*, https://www.webull.com/cash-management (last visited Jan. 23, 2025).

Vanguard's rate is 3.65%,[37] Fidelity's rate is 2.19%,[38] and Robert W. Baird's rate is between 1.37% and 2.83%.[39]

- **Other Interest-Bearing Accounts Offered by Defendants**.  Further, the sweep interest rates paid by the Sweep Programs were far lower than the interest rates paid by other products offered by Defendants outside of the Sweep Programs.  For example, LPL offered its customers the J.P. Morgan U.S. Government Money Market Fund, which currently yields 3.89%, and the J.P. Morgan U.S. Treasury Liquidity Fund, which currently yields 4.24%.[40]

- **Federal Funds Rate**.  The sweep interest rates in the Sweep Programs were also far below the U.S. Federal Reserve's benchmark federal funds rate, currently at 4.25% to 4.50%.[41]

- **Treasury Bill Rates**.  The sweep interest rates in the Sweep Programs were far below U.S. Treasury bill rates, including the three-month and one-year rates currently at 4.21% and 3.98%, respectively.[42]

---

[37]  Vanguard, *Earn 3.65% APY with the Vanguard Cash Plus Account*, https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last visited Jan. 23, 2025).

[38]  Fidelity, *Fidelity Individual Retirement Accounts (IRA)*, https://digital.fidelity.com/prgw/digital/fdic-interest-rate/ira (last visited Jan. 23, 2025).

[39]  Baird, *Cash Sweep Program*, https://www.rwbaird.com/cashsweeps/ (last visited Jan. 23, 2025).

[40]  *Account Packet – LPL Master Account*, *supra* note 1 at 8; J.P.Morgan Asset Management, *JPMorgan U.S. Government Money Market Fund*, https://am.jpmorgan.com/us/en/asset-management/adv/products/jpmorgan-us-government-money-market-fund-morgan-4812c2676 (last visited Jan. 23, 2025); J.P.Morgan Asset Management, *JPMorgan Liquidity Funds – USD Treasury CNAV Fund*, https://am.jpmorgan.com/es/en/asset-management/liq/products/jpm-usd-treasury-cnav-institutional-dist-lu0176038411 (last visited Jan. 23, 2025).

[41]  Federal Reserve, *Economy at a Glance – Policy Rate* (Dec. 19, 2024), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm.

[42]  Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis* (Jan. 22, 2025), https://fred.stlouisfed.org/series/DTB3; Federal Reserve Bank of St. Louis, *1-Year Treasury Bill Secondary Market Rate, Discount Basis* (Jan. 22, 2025), https://fred.stlouisfed.org/series/DTB1YR.

- **Repurchase Rate**. The sweep interest rates in the Sweep Programs were well below the overnight interest rate at which the U.S. Federal Reserve repurchases securities from private banks (*i.e.*, the repo rate), which is currently 4.25%.[43]

31.    These benchmarks individually and collectively demonstrated that Defendants' sweep interest rates were unreasonable. As a result, Plaintiff and the Class (defined below) suffered damages by receiving far lower interest payments than they would have received if the sweep interest rates were reasonable.

**Defendants Breached Their Contractual Obligations and Fiduciary Duties Related to Their Sweep Programs**

32.    Under the Program Documents, LPL Financial agreed to act as its customers' agent in connection with the Sweep Programs, and, thus, was contractually obligated to act in its customers' best interests in seeking and negotiating reasonable sweep interest rates under the Sweep Programs. In other words, reasonableness was implicit in the Program Documents and governed the sweep interest rates paid to customers in the Sweep Programs. However, as discussed above, LPL Financial failed to act in its customers' best interests because the sweep interest rates were unreasonable compared to compared to several objective benchmarks.

33.    Defendants also violated their contractual duties to provide reasonable rates of return on their customers' retirement account balances pursuant to the Internal Revenue Code ("IRC") and Employee Retirement Income Security Act of 1974 ("ERISA"), which were incorporated into Program Documents governing retirement accounts. The Master Account Agreement, for example, stated that retirement plan fiduciaries "represent[] and warrant[] that this

---

[43]    Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate: Treasury Securities Sold by the Federal Reserve in the Temporary Open Market Operations* (Jan. 22, 2025), https://fred.stlouisfed.org/series/RRPONTSYAWARD.

brokerage account relationship [with LPL Financial] is permitted by . . . laws applicable to such Plan," including Section 4975 of the IRC and the fiduciary provisions of ERISA.[44]

34.    Section 4975 of the IRC states that "prohibited transaction[s]" involving a retirement plan include any direct or indirect "transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan"; "act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account"; or "receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan."[45] A "disqualified person" under Section 4975 of the IRC includes a "fiduciary" and "a person providing services to the [retirement] plan."[46]

35.    Therefore, LPL Financial was a "disqualified person" under Section 4975 of the IRC because it was a service provider of LPL Financial's retirement accounts and a fiduciary of LPL Financial's retirement account customers in connection with the Sweep Programs. Because LPL Financial was a disqualified person, cash sweeps from LPL Financial's retirement accounts

---

[44]    *Account Packet – LPL Master Account*, *supra* note 1 at 20; *see also Custodial Agreement PTC – IRA*, *supra* note 20 at 2 ("The Depositor understands that certain transactions are prohibited in IRAs under Section 4975 of the [IRC]."); *Custodial Agreement PTC – Roth IRA*, *supra* note 21 at 2 ("The Depositor understands that certain transactions are prohibited in Roth IRAs under Section 4975 of the [IRC]."); *Banking & Lending Solutions Deposit Cash Account Disclosure Booklet*, *supra* note 12 at 3 (the DCA Program is "available only to individual retirement accounts (IRAs) subject to Section 4975 of the [IRC] in certain LPL advisory programs").

[45]    26 U.S.C. §4975(c)(1)(D)-(F).

[46]    26 U.S.C. §4975(e)(2)(A)-(B); *see also* Department of the Treasury, Internal Revenue Service, *Distributions from Individual Retirement Arrangements (IRAs)*, Publication 590-B (Mar. 12, 2024), https://www.irs.gov/pub/irs-pdf/p590b.pdf (stating that "disqualified persons include your fiduciary," such as anyone who "[e]xercises any discretionary authority or discretionary control in managing your IRA or exercises any authority or control in managing or disposing of its assets," and that "prohibited transactions" are "any improper use of your traditional IRA account or annuity by you, your beneficiary, or any disqualified person").

to the Program Banks, for the benefit of LPL, were "prohibited transactions" under Section 4975 of the IRC.

36.    The IRC provides limited "exemptions" to prohibited transactions under Section 4975, including "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution."[47]  However, cash sweeps under the Sweep Programs were not exempt because the Program Banks did not pay reasonable sweep interest rates, as discussed above.

37.    Similarly, Section 408 of ERISA exempts interested party transactions involving the investment of retirement account assets in bank deposits only if they "bear a reasonable interest rate."[48]  This exemption did not apply because the Program Banks did not pay reasonable sweep interest rates.

38.    Thus, Defendants' cash sweeps from retirement accounts under the Sweep Programs violated the IRC, ERISA, and the contractual provisions of the Program Documents that incorporated the IRC and ERISA.

39.    In addition to its contractual obligations, as an investment advisor, LPL Financial owed fiduciary duties to its clients under the Advisers Act.[49]  In particular, LPL Financial was

---

[47]  26 U.S.C. §4975(d)(4).  Department of the Treasury regulations confirm that, under the IRC, investing retirement plan assets in deposits in a disqualified bank is exempted only if the deposits "bear[] a reasonable rate of interest" and, "in the case of a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization must name the institution and "state that [it] . . . may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)."  26 C.F.R. §54.4975-6(b)(1), (3)

[48]  29 U.S.C. §1108(b)(4).

[49]  *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019) (interpreting Section 206 of the Advisers Act, 15 U.S.C. §80b-6).

obligated to "serve the best interest of its client and not subordinate its client's interest to its own" and was not permitted to "place its own interests ahead of the interests of its client."[50] Consistent with these fiduciary duties, the Program Documents stated that LPL Financial was committed "to act in your best interest and not place our interests ahead of yours."[51]

40.    LPL Financial owed similar duties of care under Regulation Best Interest, which required it to act in its retail customers' best interests and prohibited LPL Financial from placing its own interests ahead of its retail customers' interests.[52]

41.    LPL Financial violated these fiduciary duties under the Advisers Act and Regulation Best Interest by failing to act in its customers' best interests, and by placing its own interests ahead of its clients, when it provided customers with unreasonably low sweep interest rates compared to several objective benchmarks.

42.    LPL Financial also violated the Advisers Act by failing to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation, by you and your supervised persons, of the [Advisers] Act and the rules that the [SEC] has adopted under the [Advisers] Act."[53]

43.    These allegations are strongly supported by the fact that the Sweep Programs are under scrutiny from state and federal regulators.  In March 2022, it was reported that the Massachusetts Secretary of the Commonwealth, William Galvin, launched an investigation against

---

[50]  *Id.*

[51]  *See Account Packet – LPL Master Account*, *supra* note 1 at 3.

[52]  *See* Securities and Exchange Commission, Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318, 33320, 17 C.F.R. §240.15l-1 (July 12, 2019).

[53]  17 C.F.R. § 275.206(4)-7.

LPL and other brokerages concerning their sweep programs.[54]   In connection with the investigation, Galvin sent a letter to LPL and the other brokerages asking whether they planned to increase interest rates for sweep program customers in response to a hike in the Federal Funds Rate.[55]   In a statement regarding the investigation, Galvin said that consumers were "being hit with the double-whammy of higher credit card and loan rates on one end and low rates of interest on their bank accounts and other investments.  It's simply unfair that consumers are being asked to pay more on credit cards and loans, while the banks are pocketing the interest rate hikes that should be earned on custodial money instead of raising interest rates for people who are trying to keep their savings."[56]

44.    Moreover, in August 2024, LPL Holdings disclosed that, "in August 2024, the Company received a request for information from the SEC regarding certain elements of the Company's cash management program for corporate advisory accounts, which based on the nature of the request we believe is part of an industry-wide inquiry.  The Company has been cooperating with the request."[57]

**Defendants Made Material Misrepresentations and Omissions Regarding Their Sweep Programs**

45.    In the Program Documents, Defendants made material omissions by failing to disclose that, as discussed above, Defendants established and used the Sweep Programs to enrich

---

[54] Wealth Management, *Galvin Pushes Brokers on Interest Rates and Sweep Accounts*, https://www.wealthmanagement.com/regulation-compliance/galvin-pushes-brokers-interest-rates-and-sweep-accounts (Mar. 17, 2022).

[55] *Id.*

[56] *Id.*

[57] LPL Financial Holdings Inc., Quarterly Report (Form 10-Q), at 7 (Nov. 4, 2024), https://investor.lpl.com/static-files/1ab9cd08-7e55-4085-be2a-f2c052723ff7.

themselves by paying unreasonably low interest rates to customers in order to increase the financial benefits to themselves.

46.    The Program Documents also misleadingly stated that "[t]he interest rates paid by a[n] [ICA Program] Bank *may be* higher or lower than the interest rates available to depositors making deposits directly with the [ICA Program] Bank or other depository institutions in comparable accounts and for investments in money market mutual funds and other cash equivalent investments available through LPL"[58] and "[t]he interest rates you receive from a [DCA Program] Bank *may be* higher or lower than the interest rates available to depositors making deposits directly with the [DCA Program] Bank or other depository institutions in comparable accounts and for investments in money market mutual funds and other cash equivalent investments available through LPL."[59]  These statements were misleading and omitted material facts because, in reality, interest rates in the Sweep Programs were *always* significantly below market alternatives (*i.e.*, the payment of below-market interest rates was not a mere possibility that "may" occur).

47.    Further, the Program Documents misleadingly stated that, "[d]epending on interest rates and other *market factors*, the yields on the ICA program have been, and *may continue in the future to be*, lower than the aggregate fees and expenses received by LPL for your participation in the ICA program"[60] and "depending on interest rates and other *market factors*, the yields on the

---

[58]    *Banking & Lending Solutions Insured Cash Account Disclosure Booklet*, *supra* note 2 at 8; *see also Account Packet – LPL Master Account*, *supra* note 1 at 31 ("Interest rates under [the] ICA [Program] . . . may be lower than the interest rates available if customers make deposits directly with a bank or other depository institution outside of LPL's brokerage platform or invests in a money market fund or other cash equivalent.").

[59]    *Banking & Lending Solutions Deposit Cash Account Disclosure Booklet*, *supra* note 12 at 5.

[60]    *Banking & Lending Solutions Insured Cash Account Disclosure Booklet, supra* note 2 at 7; *see also Account Packet – LPL Master Account*, *supra* note 1 at 31 ("Depending on interest rates and other *market factors*, the yields on the ICA [Program] . . . have been, and *may continue in the*

DCA program have been, and ***may continue in the future to be***, lower than the aggregate fees and expenses received by LPL for your participation in the DCA program."[61]  These statements were misleading because they implied that the interest rates in the Sweep Programs were based on "market factors" and "may be" lower than aggregate fees and expenses received by LPL when, in fact, the interest rates were ***always*** well below market rates and the yields were ***always*** substantially lower than the aggregate fees and expenses received by LPL.

48.    The Program Documents misleadingly stated that the fiduciary of a retirement plan account with LPL Financial "represents and warrants that this brokerage account relationship [with LPL Financial] is permitted by . . . laws applicable to such Plan" including "the fiduciary duty provisions of ERISA or the prohibited transaction rules under Section 4975 of the [IRC]"[62]; that "certain transactions are prohibited in IRAs under Section 4975 of the [IRC]"[63]; and that "certain transactions are prohibited in Roth IRAs under Section 4975 of the [IRC]."[64]  These statements were misleading and omitted material facts because, as discussed above: (a) Defendants paid unreasonably low interest rates on cash that LPL Financial swept from retirement accounts and deposited into the Program Banks; and (b) such deposits were prohibited transactions that were not compliance with Section 4975 of the IRC or Section 408 of ERISA.

---

***future to be***, lower than the aggregate fees and expenses received by LPL for a customer's participation in the cash sweep programs.").

[61]    *Banking & Lending Solutions Deposit Cash Account Disclosure Booklet*, *supra* note 12 at 7.

[62]    *Account Packet – LPL Master Account*, *supra* note 1 at 20.

[63]    *Custodial Agreement PTC – IRA*, *supra* note 20 at 2.

[64]    *Custodial Agreement PTC – Roth IRA*, *supra* note 21 at 2.

49.     Moreover, Defendants' statements about potentially *lower* interest rates did not excuse their contractual and fiduciary obligations to pay *reasonable* interest rates, as described above.   These statements must be construed harmoniously with Defendants' contractual and fiduciary obligations.

**Defendants Violated the RICO Statute**

50.     Defendants violated the RICO Statute through their implementation of the Sweep Programs.

51.     LPL Financial and the Program Banks were an "enterprise" within the meaning of the RICO Statute.   Through LPL Financial and the Program Banks, Defendants knowingly and intentionally devised and operated the Sweep Programs as a scheme to defraud customers, including Plaintiff and the Class.   Defendants used the Sweep Programs to benefit and enrich themselves through, among other things, the payment of unreasonably low interest rates to customers on money deposited into the Sweep Programs.

52.     The Sweep Programs involved commercial activities across state lines, including Defendants' distribution of the Program Documents to customers, and Defendants' receipt and transfer of money deposited by customers.

53.     Through the Sweep Programs, Defendants conducted and participated in a pattern of racketeering activity within the meaning of the RICO Statute ("Racketeering Acts"). Defendants' Racketeering Acts included indictable, predicate offenses under 18 U.S.C. §§1341 and 1343 based on Defendants' fraudulent use of interstate mail and wire communications, including posting the materially false and misleading Program Documents on LPL's public website and distributing them to customers throughout the country.

54.    The Racketeering Acts were related in that they were taken in furtherance of Defendants' Sweep Programs scheme.  The Racketeering Acts occurred, and continue to occur, regularly and continuously over a multi-year period during the operation of the Sweep Programs.

55.    Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Programs scheme, including posting the materially false and misleading Program Documents on LPL's public website and distributing them to customers throughout the country.

56.    As customers of the Sweep Programs, Plaintiff and the Class were damaged by Defendants' Racketeering Acts due to Defendants' payment of unreasonably low interest rates on the money customers deposited into the Sweep Programs.

## CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action against Defendants as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all customers who had cash deposits or balances in the Sweep Programs ("Class").  Excluded from the Class are Defendants, officers and directors of Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

58.    The Class members are so numerous that their individual joinder is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, and are geographically dispersed, because LPL oversees approximately $1.6 trillion in client assets worldwide.

59. Plaintiff's claims are typical of Class members' claims because Plaintiff's cash deposits were subject to the Sweep Programs, and, therefore, Plaintiff's claims, and those of all other Class members, arose from the same wrongful conduct by Defendants alleged herein.

60. Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in complex class action litigation. Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.

61. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class or a risk of adjudications that, as a practical matter, would be dispositive of the interests of other Class members who were not parties to the adjudications or would substantially impair or impede the ability of such Class members to protect their interests.

62. Because Defendants act or refuse to act on grounds that apply generally to the Class, final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

63. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

64.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants act on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the laws as alleged herein;

(b)    whether Defendants owed fiduciary duties to Plaintiff and members of the Class in connection with the Sweep Programs;

(c)    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class in connection with the Sweep Programs;

(d)    whether Defendants breached their contractual obligations to Plaintiff and members of the Class in connection with the Sweep Programs;

(e)    whether Defendants violated the Advisers Act;

(f)    whether Defendants violated the RICO Statute;

(g)    whether Defendants made material misrepresentations and/or omissions in connection with the Sweep Programs;

(h)    whether Defendants were unjustly enriched by their wrongful conduct;

(i)    whether the members of the Class sustained damages as a result of the alleged wrongful conduct by Defendants, and, if so, the appropriate measure of damages; and

(j)    whether the members of the Class are entitled to attorneys' fees and costs and, if so, the appropriate amount of attorneys' fees and costs.

### COUNT I

### BREACH OF FIDUCIARY DUTY
### AGAINST ALL DEFENDANTS

65.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

66.     During the relevant time period, LPL Financial was the agent of, and investment advisor to, customers enrolled in the Sweep Programs, including Plaintiff and the Class.  LPL Holdings owned and controlled LPL Financial.

67.     LPL Financial owed fiduciary duties to Plaintiff and the Class, including duties to act in the best interests of, and deal fairly and honestly with, Plaintiff and the Class.

68.     LPL Financial violated their duties to act in the best interests of Plaintiff and the Class by using the Sweep Programs to enrich themselves, LPL Holdings, and the Program Banks at the expense of customers who were paid unreasonably low interest rates, as described above.

69.     LPL Financial also violated their duties to deal fairly and honestly with Plaintiff and the Class by making material misrepresentations and omissions in the Program Documents, as described above.

70.     Further, LPL Financial violated their duties to act with reasonable care to verify the truthfulness of the information set forth in the Sweep Programs, which were materially misleading and omitted material facts for the reasons described above.

71.     As a direct and proximate result of LPL Financial's breaches of fiduciary duties, Plaintiff and the Class suffered damages and are entitled to recover such damages from Defendants.

## COUNT II

## VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940
## AGAINST ALL DEFENDANTS

72.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

73.     During the relevant time period, LPL Financial was registered as an investment adviser under the Advisers Act.  LPL Holdings owned and controlled LPL Financial.

74.     For the reasons alleged herein, LPL Financial violated Section 206 of the Advisers Act in connection with its operation of the Sweep Program by failing to serve the best interests of its clients, by placing its own interests ahead of the interests of its clients, and by failing to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act.  *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019); 17 C.F.R. § 275.206(4)-7.

75.     The Master Account Agreement should be deemed void pursuant to Section 215(b) of the Advisers Act, which provides that every

> contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

76.     Accordingly, Plaintiff seeks rescission of the Master Account Agreement and restitution of the consideration given pursuant to its purported terms.

## COUNT III

## BREACH OF CONTRACT
## AGAINST ALL DEFENDANTS

77.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

78.     Plaintiff and Class members were parties to the Program Documents with LPL Financial.  The Program Documents set forth the contractual terms and conditions of the Sweep Programs.  LPL Holdings owned and controlled LPL Financial.

79.     Pursuant to the Program Documents, LPL Financial was contractually obligated to act as agent on behalf of Plaintiff and the Class, and, thus, was contractually obligated to act in Plaintiff's and the Class' best interests in seeking and negotiating reasonable sweep interest rates under the Sweep Programs.

80.     LPL Financial breached their contractual obligations by failing to provide Plaintiff and the Class with reasonable interest rates on their deposits in the Sweep Programs.  Rather, the sweep interest rates provided by LPL Financial was below market and unreasonably low.  As such, LPL Financial denied Plaintiff and the Class the full benefit of their bargain under the Program Documents.

81.     As a direct and proximate result of LPL Financial's breaches of contract, Plaintiff and the Class sustained damages.

**COUNT IV**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING
AGAINST ALL DEFENDANTS**

82.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

83.     Plaintiff and Class members were parties to the Program Documents with LPL Financial.  The Program Documents set forth the contractual terms and conditions of the Sweep Programs.  LPL Holdings owned and controlled LPL Financial.

84.     Implicit in the Program Documents were duties of good faith and fair dealing.

85.     LPL Financial breached their duties of good faith and fair dealing by failing to provide Plaintiff and the Class with fair and reasonable sweep interest rates on their cash sweep balances in the Sweep Programs.  Rather, the interest rates provided by LPL Financial was below market and unreasonably low.  As such, LPL Financial denied Plaintiff and the Class the full benefit of their bargain under the Program Documents.

86.     As a direct and proximate result of LPL Financial's breaches of the implied covenants of good faith and fair dealing, Plaintiff and the Class sustained damages.

## COUNT V

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962(c)-(d), AGAINST ALL DEFENDANTS

87.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

88.     This claim arises under 18 U.S.C. §1962(c)-(d) of the RICO Statute, which provides in relevant part:

> (c)     It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

> (d)     It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

89.     At all relevant times, LPL Holdings was a "person" because it was capable of holding a legal or beneficial interest in property.

90.     During the relevant time period, LPL Financial and the Program Banks were an enterprise engaged in interstate commerce.  Through LPL Financial and the Program Banks, Defendants knowingly and intentionally devised and operated the Sweep Programs as schemes to defraud investors.  Defendants used the Sweep Programs to enrich themselves and the Program Banks by paying unreasonably low interest rates to customers of the Sweep Programs.

91.     Defendants conducted and participated in multiple, related Racketeering Acts for the purpose of implementing the Sweep Programs.  The Racketeering Acts, which occurred, and continue to occur, regularly and continuously during the operation of the Sweep Programs over a multi-year period, constituted a "pattern of racketeering activity."  The Racketeering Acts were

made possible by the regular, repeated, and continuous use of the employees, facilities, and services of LPL Financial.

92.    Defendants' Racketeering Acts included the following indictable, predicate offenses:

(a)    **Mail Fraud**: Defendants violated 18 U.S.C. §1341 by sending and receiving materials via United States mail and commercial interstate carriers, including the Program Documents, for the purpose of conducting the fraudulent Sweep Programs scheme through LPL Financial and the Program Banks.  As described above, the Program Documents contained material misrepresentations and omissions knowingly and intentionally made by Defendants for the purpose of defrauding customers.

(b)    **Wire Fraud**: Defendants violated 18 U.S.C. §1343 by transmitting and receiving writings and sounds by means of interstate wire communication for the purpose of conducting the fraudulent Sweep Programs scheme through LPL Financial and the Program Banks.  The writings included the Program Documents, which were posted on LPL's public website.  As described above, the Program Documents contained material misrepresentations and omissions knowingly and intentionally made by Defendants for the purpose of defrauding customers.

93.    Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Programs scheme, including mailing and transmitting the Program Documents to customers.

94.     Plaintiff and the Class suffered damages by reason of Defendants' payment of unreasonably low interest rates on their deposits in the Sweep Programs, in violation of 18 U.S.C. §1962(c)-(d).

95.     Plaintiff's and the Class' injuries were directly and proximately caused by Defendants' racketeering activity.

**COUNT VI**

**NEGLIGENCE**
**AGAINST ALL DEFENDANTS**

96.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

97.     During the relevant time period, LPL Financial was the agent of customers enrolled in the Sweep Programs, including Plaintiff and the Class.  LPL Financial also facilitated the Sweep Programs by accepting payments from customers through its online investment platform, which are swept into the Sweep Programs.  LPL Holdings owned and controlled LPL Financial.

98.     Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Sweep Programs.

99.     Defendants' conduct with respect to the Sweep Programs, as described above, was negligent.  By failing to provide Plaintiff and the Class with fair and reasonable sweep interest rates on their cash sweep balances in the Sweep Programs, Defendants breached their duty to act with reasonable care.

100.    Defendants' negligence directly and proximately caused harm to Plaintiff and the Class.

**COUNT VII**

**NEGLIGENT MISREPRESENTATIONS AND OMISSIONS**
**AGAINST ALL DEFENDANTS**

101.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

102.    During the relevant time period, LPL Financial was the agent of customers enrolled in the Sweep Programs, including Plaintiff and the Class.  LPL Financial also facilitated the Sweep Programs by accepting payments from customers through its online investment platform, which are swept into the Sweep Programs.  LPL Holdings owned and controlled LPL Financial.

103.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Sweep Programs.

104.    Defendants negligently made material misrepresentations and omissions in the Program Documents, as described above, which were posted on LPL's public website.

105.    Plaintiff and the proposed Class justifiably relied on Defendants' Program Documents and accordingly deposited and maintained cash balances in the Sweep Programs to their detriment.

106.    Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the members of the proposed Class.

## COUNT VIII

### UNJUST ENRICHMENT
### AGAINST ALL DEFENDANTS

107.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

108.    Defendants financially benefitted from the unlawful acts alleged herein by paying Plaintiff and the Class unreasonably low and below-market interest payments on their balances in the Sweep Programs.  These unlawful acts caused Plaintiff and the Class to suffer injury and monetary loss.

109.    As a result of the unlawful acts alleged herein, Defendants were unjustly enriched at the expense of Plaintiff and the Class.

110.    Defendants have received, and are holding, funds belonging to Plaintiff and the Class, which in equity Defendants should not be permitted to keep but should be required to refund to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.    Declaring that this action is a proper class action, certifying the Class, appointing Plaintiff as representative of the Class, and appointing Plaintiff's counsel as Class Counsel for the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the Class for all damages sustained as a result of Defendants' wrongdoing, in amounts to be proven at trial, including interest thereon;

C.    Awarding treble damages in favor of Plaintiff and the Class;

D.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

E.    Ordering rescission of the Master Account Agreement and restitution of all fees and other benefits received by Defendants thereunder; and

F.    Such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: January 23, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
STEPHEN R. ASTLEY
ANDREW T. REES
RENE A. GONZALEZ
SCOTT I. DION

*s/ Stephen R. Astley*
STEPHEN R. ASTLEY

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
sastley@rgrdlaw.com
arees@rgrdlaw.com
rgonzalez@rgrdlaw.com
sdion@rgrdlaw.com

LAW OFFICE OF ALFRED G.
  YATES, JR., P.C.
ALFRED G. YATES, JR.
1575 McFarland Road, Suite 305
Pittsburgh, PA  15216
Telephone: 412/391-5164
yateslaw@aol.com

*Attorneys for Plaintiff*